## FIRST NAT. BANK OF CHICAGO et al.
## v. IRVING TRUST CO.
### No. 151.

Circuit Court of Appeals, Second Circuit.

Dec. 17, 1934.

Perlie P. Fallon, of New York City (Charles H. Watson and Guernsey Price, both of New York City, of counsel), for appellants.

Cravath, De Gersdorff, Swaine & Wood, of New York City (William D. Whitney, Carl W. Painter, and Frank H. Detweiler, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from an order of the referee which the judge affirmed, reducing a claim against the bankrupt estate on the ground that in greater part it was for future rent and therefore not provable under Manhattan Properties v. Irving Trust Co., 291 U. S. 320, 54 S. Ct. 385, 78 L. Ed. 824. The bankrupt held on lease for different periods six parcels of real estate in various cities in the United States, some of which it wished to improve. For some undisclosed reason it was unwilling to issue a series of bonds on which it should appear directly liable, and so adopted the following device: An employee, one

Wolfson, it directed to execute bonds to the amount of $450,000 which were taken by the public through the mediation of a firm of bankers. These were secured by a mortgage upon the six terms just mentioned, but instead of granting them direct to the mortgage trustees, it first assigned them to Wolfson who as part of the same transaction gave back to it a blanket sublease covering five of the parcels. Wolfson then assigned all seven leases to the mortgagees; the six terms which he held as assignee, and the reversion on the sublease of which he was lessor. The claim in suit was grounded upon a covenant in this sublease which must be described in a little detail. Article I sublet the five parcels, and article II, which was headed "Rental", provided in section one that the bankrupt as sublessee, should pay "as rent * * * all sums that during the term of this lease became due and payable by the Lessees under the following described Leases." Then followed a description of all six of the parcels. Thus the sublessee as rent for five parcels agreed to pay the original rent of the six. By section two of article II the bankrupt agreed generally to perform all the covenants of the six leases, and by section three to pay to the sublessor certain specified amounts semi-annually. Wolfson agreed to pay off the principal of the bonds in annual installments, and the payments prescribed in this section corresponded to a cent with the interest and amortization charges; the section did not describe these payments as rent. The third article provided that the mortgagees might enforce all its covenants, and that the sublessee should perform them "without regard to the validity of" any of the six leases, "and without regard to whether the Lessee occupies any or all of the properties" covered by the five leases, "it being the intent of the parties that the Lessee hereby unconditionally agrees to perform all its covenants herein contained." The fourth article gave to Wolfson the usual remedies of a lessor, including the right of re-entry upon default, with power to relet and charge the lessee for the difference. The claim was for all the installments of the bonds as described in section three of article II; the referee reduced it to the sums due before petition filed and the claimants appealed.

No question is raised, or could be, as to the capacity of the mortgagee-trustees to press the claims, so far as they are provable at all. Nor can it be asserted after Irving Trust Co. v. A. W. Perry, 293 U. S. 307, 55 S. Ct. 150, 79 L. Ed. ——, that all claims arising under

covenants in a lease must stop at petition filed, even indeed though they be a substitute for rent, which this was not. The answer depends upon whether the sums payable are fixed in obligation and amount. So we thought in Irving Trust Co. v. Perry when we decided it; so we think after its affirmance. Therefore the question is whether the payments were intended to be absolute, regardless of the continuation of the terms, or whether like rents, the obligation ended with the leases. The contrast between section 1 which speaks of the payments as "rents," and section 3 which merely requires the payment of the installments, is the first important circumstance; and article III lays any remaining doubts. The covenants are to be absolute, regardless not only of the validity of the six leases, but of the sub-lessee's continued occupation of the five; and to clinch the meaning there is the general clause that all the covenants are unconditional. It must be conceded that taken literally, this argument proves too much, for article III covers not only the payments required by section 3 of article II, but by the two earlier sections. The parties could not have meant that the sub-lessee should keep on paying the rents to the original lessors after eviction by them. For this reason the trustee urges that as the language cannot be given its literal scope throughout, it must be read as contingent throughout, as putting the payments on the bonds in the same class as the rents.

We cannot agree. In the first place we are to remember that all the covenants are made in form unconditional and that the rents are excepted only because of article IV which is applicable alone to them, and presumably because of similar provisions in the six original leases. This might not be important, if the payments had been themselves classed as rents, but they were not, as we have said, and the distinction was deliberate. Moreover, viewed more generally and at large, it is very unlikely that the parties should have intended them to be conditional upon the preservation of the terms. Were they to be allocated according to the value of the land; were they to continue until the last term ended; or only until the first? The lease is not drawn with an eye to any equivalence between the payments and the enjoyment of the terms. Moreover, if the section is conditional, the consequence is to leave the bonds without any promise of payment whatever, in case the terms are forfeited. Wolfson we may safely count out; although his financial responsibility does not appear, it is incredible that he should have been put forward as the real obligor. The bonds would not be obligations at all; they would be secured only by the leases and nobody could sue to recover the principal and interest, if the bankrupt chose to default on the rents. It is true that the original lessors could sue for the rents as they fell due, and perhaps for damages after subletting; but that would not help the bondholders. Wolfson and his assignees might also conceivably sue upon the promise to pay the rentals to the original lessors, but their damages as reversioners would at most be only the value of the terms, which being relet at the old rents, were worth nothing to them. Unless the promises in section 3 were absolute, the whole scheme was a fraud. Perhaps it was not sound finance anyway, but we are to assume that the bankrupt meant to give the bondholders some responsible obligor, some one other than a dummy selected from its office. And in support of that assumption we have language in form absolute.

Order reversed; claim to be allowed in full.